## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 24-cr-00062 (ABJ)** |
| **v.** | |
| **DONALD ZEPEDA,** | |
| **Defendant.** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

As a leader and organizer for Declare Emergency, Mr. Zepeda has spent the past two years waging a campaign of damage against our community. Mr. Zepeda has planned and assisted in at least three attacks against public museums, along with the blocking of roadways in conjunction with those attacks. His efforts resulted in harm to two different exhibits at the National Gallery of Art and to the display of the U.S. Constitution in the National Archives. His conduct caused harm to those museums, fear for its employees, and loss to hundreds of visitors who sought to appreciate these iconic objects of art, culture, and historical significance. These are not Mr. Zepeda's first offenses. He has been engaging in similar crimes his entire adult life. And he committed these offenses despite previous periods of incarceration and court-imposed supervision for these offenses. Mr. Zepeda has never expressed any remorse for the harm he has caused and is unlikely to change his behavior absent a significant sentence. For the following reasons, the Government requests that the Court sentence Mr. Zepeda to four years' incarceration, followed by three years of supervised release, to include stay-away orders from Washington, D.C. and museums, and community service.[1]

---

[1] The Government is submitting along with this memorandum, a Victim Impact Statement from the Archivist of the United States on behalf of the National Archives and Records Administration. The National Gallery of Art is in the process of finalizing their statement and the Government

## **BACKGROUND**

Donald Zepeda has been an active member of Declare Emergency since at least 2022, oftentimes holding various leadership roles in the group. Based on internal documents, Declare Emergency is the name used by a group of activists that purport to raise awareness regarding climate change and by engaging in a variety of criminal offenses, primarily in Washington, D.C. The number of active members of Declare Emergency has changed over time, but it appears there are approximately six core members with additional members joining specific meetings or events on an *ad hoc* basis.   At various times, Mr. Zepeda has held the following roles:   Squad Coordinator, External Coordinator, Legal Liaison, and head of Mobilization. In these roles he has organized and participated in a series of criminal offenses in Washington, D.C., culminating in his attack on the U.S. Constitution.

### ***Zepeda's Role in the April 2023 Attack at the National Gallery of Art (NGA)***

During the week of April 24, 2023, members of Declare Emergency, including Donald Zepeda, orchestrated an escalating series of offenses in Washington, D.C. Based on Declare Emergency records, Zepeda began drafting the "Action Plan" for the April 2023 offenses as early as January 28, 2023.   *See* Exhibit A, DE000864 ("CT asks for an Action Plan for April 2023).

*First*, on Monday, April 24, 2023, members of Declare Emergency blocked the intersection of New York Avenue and I-395 NE starting at approximately 8:17 AM. The suspects were given multiple warnings to leave the roadway but refused to do so. They were removed by force and arrested. Declare Emergency posted video of the offense to social media. Zepeda participated in this offense, filming and coaching the individuals who were in the roadway.

---

anticipates filing that statement no later than Friday, November 1, 2024.

*Figures 1-3*





Video taken by Zepeda was then compiled into social media posts shared by Declare Emergency. *See* Exhibit B, Video Compilation of April 2023 Offenses.

    *Second*, on Wednesday, April 26, 2023, members of Declare Emergency blocked the northbound lane of the George Washington Memorial Parkway beginning sometime before 8:25

AM. Once again, Mr. Zepeda was present and assisted the individuals who were blocking the roadway, providing apparent advice and guidance to them as they did so.

*__Figure 4__*



On Thursday, April 27, 2023, Joanna Smith, Timothy Martin, Donald Zepeda, and other members of Declare Emergency entered the National Gallery of Art (NGA). Martin and Smith approached the "Little Dancer Aged Fourteen" exhibit and smeared red and black paint on the case, base, and floor surrounding the exhibit.

The following photos reflect the damage to the sculpture's case and base:

*Figures 5-8*





As evidenced by the receipt pictured below in Figure 9, Mr. Zepeda purchased the paint

that was used in this offense from Blick Art supplies in Washington, D.C. on April 20, 2023, one

week before the offense.

5

*Figure 9[2]*



As with the prior offenses, Mr. Zepeda took video.   He filmed a statement of intent by Martin outside of NGA prior to the offense. *See Exhibit C*.   He took video during the offense.

---

[2] This receipt was provided to the Government by counsel for Defendant Timothy Martin as part of reciprocal discovery in *United States v. Timothy Martin*, 23-cr-00182 (ABJ).

*Figure 10*



And he videotaped Mr. Martin after Martin was released on a citation. *See* Exhibit D.

Surveillance video reflects that immediately prior to the offense, Martin and Smith provided their cellphones to Donald Zepeda in an alcove of NGA.

*Figures 11 and 12*

| *Smith hands phone to Zepeda* | *Martin hands phone to Zepeda* |

 

7

He also consulted with them in the moment before they attacked the exhibit.

*Figure 13*



Declare Emergency took responsibility for the attack on their website and on Twitter:

*Figures 14 and 15*



Notably, Donald Zepeda was listed under "Media Contacts" in Declare Emergency's statement.

*Excerpt of Figure 15*



Following the April 2023 attacks, on April 30, 2023, Zepeda hosted an online training for individuals who were interested in participating in similar attacks. *See Figure 16.*

**Figure 16**



**The November 14, 2023 Attack at the National Gallery of Art**

On November 14, 2023, Jackson Green and other members of Declare Emergency, including Donald Zepeda, entered NGA. Green and Zepeda walked around NGA before approaching Augustus Saint-Gaudens "*The Shaw 54th Regiment Memorial*." The mural commemorates the Civil War efforts of 54th Massachusetts Volunteer Infantry, which was one of the first regiments of African Americans in our country's history. The mural was completed in

1900 by Augustus Saint-Gaudens. The mural has been on long-term loan to NGA from the National Park Service's Saint-Gaudens National Historic Park since 1997. The Superintendent of the Saint-Gaudens National Historic Park estimated the value of the mural to be between $6 and $7 million.

After approaching the mural, Green hand-painted "Honor Them" in red paint on the wall next to the mural, below the names of the Regiment.

***Figure 17***



Zepeda and other members of Declare Emergency filmed Mr. Green's offense. Specifically, surveillance video reflects that Zepeda was positioned in the mural room prior to Green entering. As Green walked around the room, Zepeda already had his phone out to film Green's actions. Zepeda (yellow circle) positioned himself in a corner of the room to allow himself the best angle to film Green's (red circle) actions.



*Figure 18*



Zepeda's film was then shared by Declare Emergency on social media.

*Figure 19*



NGA reported that it cost $706 to repair the damage.

11

***The February 14, 2024 Attack at the National Archives***

On February 14, 2024, Jackson Green and Donald Zepeda entered the National Archives at 700 Pennsylvania Avenue NW. Green (circled in yellow) and Zepeda (circled in red) stood in front of the display of the U.S. Constitution and emptied bags containing red powder on themselves and the case.

***Figure 20***



As they did so, both made statements concerning climate change.

Green and Zepeda's offense was filmed by a reporter and shared over social media, including by other members of Declare Emergency. Their offense was also captured on National Archive surveillance video.

The National Archives was closed as a result of this attack from February 14, 2024 to February 17, 2027 to allow for repairs. The National Archives reported that it cost approximately $58,646.25 to repair the damage.

The U.S. Constitution was famously hand-penned and signed on September 17, 1787 at the Constitutional Convention at Independent Hall in Philadelphia. It is indisputably priceless. Immediately following the signing of the Constitution, thirteen copies were made, one for each of the then thirteen states. In November 2021, one of the eleven surviving copies of the thirteen sold at an auction for $43.2 million.[3] The original Constitution is singular and would undoubtedly be valued significantly higher than such a copy. The Rotunda and casing in which the Constitution was housed are also historically valuable. The National Archives Building is a National Historic Landmark—designed to serve as a shrine to the Constitution and other founding documents, with custom marble and intricate brass work throughout.

When Zepeda and Green were processed following their arrest they were still covered in red powder.

---

[3] Megan C. Hills, *First-edition copy of US Constitution sells for record $43.2 million*, CNN (November 19, 2021), available at: https://www.cnn.com/style/article/us-constitution-sothebys-sale/index.html#:~:text=An%20exceptionally%20rare%20first%2Dedition,ever%20to%20sell%20at%20auction.

*Figure 21*



Following their arrest, outside of D.C. Superior Court, Green and Zepeda were interviewed

by Georgetown University's student newspaper *The Hoya*.[4]

*Figure 22*



---

[4] *See* Ruth Abramovitz, *Climate Activists Protest at National Archives, Cover Constitution Display with Dust*, The Hoya (February 22, 2024), available at https://thehoya.com/news/climate-activists-protest-at-national-archives-cover-constitution-display-with-dust/.

During that interview, Zepeda is reported to have said that despite the backlash from the public and authorities, Declare Emergency intended to ramp up the scale and impact of their demonstrations. He is quoted as stating: "For a while now, I've kind of known that this sort of thing needs to be scaled up if we want to succeed at the scale and pace that we need to address the climate emergency."

The following day, February 16, 2024, Zepeda and at least one other member of Declare Emergency attempted a second attack at the NGA. As captured on video surveillance, Zepeda, circled in yellow below, entered the NGA while another member, circled in green below, attempted to secrete a container containing paint powder through security.

*__Figure 23__*



Security stopped the individuals and turned them away. That same day, Zepeda filmed himself in front of the White House admitting to his conduct, explaining his motivations, and promising future action. *See Figure 23.*

**Figure 24**



Zepeda's video was shared directly by Declare Emergency's Instagram feed.

On February 22, 2024, Mr. Zepeda was indicted on one count of Destruction of Federal Property in violation of 18 U.S.C. § 1361. On August 14, 2024, Mr. Zepeda pled guilty, without a plea agreement, to the sole count of the indictment against him.

### The Pre-Sentence Investigation Report

The Pre-Sentence Investigation Report (PSIR) summarizes Mr. Zepeda's personal, educational, and criminal history. Mr. Zepeda is 35 and was born in Phoenix, Arizona. PSIR at ¶ 74. Mr. Zepeda reported an "alright" childhood and was raised by both parents. PSIR at ¶¶ 74, 76. As he described: "He played video games, received good grades, and had a good number of friends." PSIR at ¶ 75. Mr. Zepeda did not report any substance abuse or mental health issues.

16

PSIR at ¶¶ 88-93. Mr. Zepeda did, however, report an instance of abuse in his childhood. PSIR at ¶ 77. Mr. Zepeda graduated high school in Holt, Michigan in 2007 and has a bachelor's degree in international relations from Grand Valley State University, also in Michigan. PSIR at ¶ 94. Mr. Zepeda has held various jobs including at Jimmy John's, Extinction Rebellion America, the Seattle Art Museum, and Subway. PSIR at ¶¶ 100-104. He also was employed by Declare Emergency for three months. PSIR at ¶ 101.

On October 24, 2017, Mr. Zepeda broke into the Kinder Morgan oil pipeline facility in Washington State in an attempt to shut down the pipeline. PSIR at ¶ 43. He was found guilty of Second-Degree Burglary, Sabotage, and Malicious Mischief following a jury trial. *Id.* He was sentenced to sixty days' confinement. *Id.*

On April 28, 2021, Mr. Zepeda unlawfully entered the grounds of Boca Raton Community High School in Florida to distribute fliers. PSIR at ¶ 44. Mr. Zepeda was not a student there and he did not have permission to be there. *Id.* Mr. Zepeda was warned to leave and briefly did so, before returning. *Id.* He was arrested, pled guilty to Trespass, and was fined $423. *Id.*

On May 27, 2021, Mr. Zepeda trespassed at Fort Myers High School in Florida. PSIR at ¶ 45. Zepeda had previously been barred from this campus for trespassing. *Id.* Zepeda was arrested after sitting in front of the main entrance. *Id.* He was found guilty and fined $500. *Id.*

On June 9, 2021, Mr. Zepeda trespassed at Sarasota High School in Florida. PSIR at ¶ 46. Zepeda was protesting climate change and was asked to leave. *Id.* He refused and was arrested. *Id.* It is not clear what sentence he received. *Id.*

On September 17, 2021, Mr. Zepeda was arrested after pouring a mixture of colored liquid and chocolate syrup on the steps of the Florida capitol building, causing approximately $500 in

damage. PSIR at ¶¶ 49, 60. Mr. Zepeda was found guilty and sentenced to seven days in jail. PSIR at ¶ 49.

On October 4, 2021, Mr. Zepeda was arrested after sitting in the middle of an interstate in Florida. PSIR at ¶ 47. He and his conspirators had superglued their hands together. *Id.* He refused to leave the roadway and was arrested. *Id.* Mr. Zepeda was initially sentenced to probation, but given re-arrests ultimately served seventy days in jail. *Id.*

On January 25, 2022, Mr. Zepeda was arrested for blocking a roadway and throwing rocks onto a parkway in Washington, D.C. PSIR at ¶ 48. After being warned to leave, Mr. Zepeda refused. *Id.* He received a probationary sentence. *Id.*

On February 13, 2024, Mr. Zepeda and others were arrested after blocking the G.W. Memorial Parkway in Arlington, Virginia. PSIR at ¶ 50. He pled guilty and was sentenced to 20 days' incarceration and a $750 fine.

The PSIR reflects that Mr. Zepeda has been arrested for similar offenses on multiple other occasions in multiple other jurisdictions. PSIR at ¶¶ 57-68.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

18

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        (i) issued by the Sentencing Commission . . .; and
        (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission . . . and
    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v.*

*United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing

judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.*at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

U.S.S.G § 2B1.1 applies to the offense as it involved "Property Damage or Destruction." U.S.S.G § 2B1.1(c)(4) provides that: "if the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources)." A "cultural heritage resource" is defined, *inter alia*, as "an object of cultural heritage, as defined in 18 U.S.C. §

668(a)(2)." Section 668(a)(2) in turn defines "object of cultural heritage" as "an object that is . . . over 100 years old and worth in excess of $5,000 . . . or . . . worth at least $100,000." The U.S. Constitution—which is 237 years' old and is worth at least $43.2 million (though likely significant more)—indisputably qualifies under either prong.

Therefore, the question for the Court is whether this offense "involved" a cultural heritage resource. The phrase "involved" is not defined in the Guidelines. "In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms." *United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022). *See also United States v. Williams*, No. CR 21-618 (ABJ), 2024 WL 1239989, at *2 (D.D.C. Mar. 22, 2024) (looking "to the plain meaning of the term at the time the provision was enacted" in interpreting the meaning of a Sentencing Guidelines provision). "To discern the text's plain meaning, courts look to dictionary definitions and analyze the word or phrase in context." *Seefried*, 639 F. Supp at 10.

Merriam Webster defines "involved" as "having a part in something; included in something."[5] The Oxford English Dictionary defines involved as "contained by implication, implicit."[6] Based on its plain meaning, this offense "involved" the U.S. Constitution.

Mr. Zepeda entered the National Archives with the purpose and intent of targeting the case containing the U.S. Constitution. He could have spread paint powder in a roadway, in a park, in any other building: he chose this building and this object. He stood in front of the U.S.

---

[5] Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/involved (last visited April 17, 2024).

[6] *Involved*, Oxford English Dictionary, https://www.oed.com/dictionary/involved_adj?tab=meaning_and_use#17982 (last visited April 17, 2024)

Constitution and not one of the many other exhibits in the Archives and emptied paint powder on

the case and on himself. His co-conspirator, Mr. Green, made a statement mentioning the founding

values of our country, an express reference to the U.S. Constitution. Mr. Zepeda did not and would

not have poured paint powder on an empty case. Therefore, this offense "involved" the U.S.

Constitution because it was the essential ingredient that animated Mr. Zepeda's actions.

This interpretation is consistent with the broad purpose animating the addition of the

Cultural Heritage Resource Guideline. U.S.S.G. § 2B1.5 was added to the Guidelines in 2002. As

the Commission stated:

> This amendment reflects the Commission's conclusion that the existing sentencing
> guidelines for economic and property destruction crimes are inadequate to punish
> in an appropriate and proportional way the variety of federal crimes involving the
> theft of, damage to, destruction of, or illicit trafficking in, cultural heritage
> resources. The Commission has determined that a separate guideline, which
> specifically recognizes both the federal government's long-standing obligation and
> role in preserving such resources, and the harm caused to both the nation and its
> inhabitants when its history is degraded through the destruction of cultural heritage
> resources, is needed.

638.Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 638 (11/1/13). The

Commission further explained: "[t]he higher base offense level represents the Commission's

determination that offenses involving cultural heritage resources are more serious because they

involve essentially irreplaceable resources and cause intangible harm to society." *Id.*

Mr. Zepeda has contended that the "cultural heritage resource" guideline does not apply

because he neither intended to nor actually harmed the U.S. Constitution. This is beside the point.

The cultural heritage resource guideline does not solely apply to offenses where a cultural heritage

resource was harmed or threatened. The Guideline applies to any offense "involving" a cultural

heritage resource. If the U.S. Sentencing Commission had intended this guideline to solely apply

to offenses where a cultural heritage resource was harmed or damaged, it easily could have said so. For example, the Commission could have crafted this provision to say: "if the offense *harmed*," "if the offense *damaged*," or even "if the offense *threatened to harm or damage*," a cultural heritage resource. It did not. Instead, it crafted a broader provision consistent with a desire to protect incredibly important cultural objects that included all offenses *involving* such objects.

This interpretation is consistent with the few cases construing this Guideline. In *United States v. Allen*, the Sixth Circuit interpreted this Guideline as applied to the theft of rare books. 516 F.3d 364, 365 (6th Cir. 2008). There, the defendants had conspired to steal rare books from a library. *Id.* The defendants attempted to take seven rare books from the library but were forced to leave two behind given the weight of the books. *Id.* at 368. All seven books were recovered unharmed and undamaged. *Id.* One defendant argued with respect to sentencing that there was no actual loss as all the objects were recovered undamaged. *Id.* at 371. Even though books were recovered unharmed and undamaged, the district court and Sixth Circuit both applied U.S.S.G. § 2B1.5. *Id.* at 376-379. Not only that, the Sixth Circuit found that the district court had erred by limiting its calculation of the offense level to the five books removed from the library and not to all seven that the defendants *attempted* to remove from the library. *Id.* Mr. Zepeda's assertion that he should only be penalized for the actual loss suffered by the Archives and the American taxpayer is completely at odds with this decision.

Moreover, Mr. Zepeda's assertion that his offense level should be limited to the Archive's restoration and cleanup costs misapplies this Guideline. If the offense "involved" a cultural heritage resource, the offense level is driven by the value of the cultural heritage resource, not solely by the cost of restoration and repair. The Application Notes to U.S.S.G. § 2B1.5 indicate

that value of the resource "shall include": (i) The archaeological value . . . (ii) The commercial value. . . ; (iii) The cost of restoration and repair." U.S.S.G § 2B1.5, Application Note 2. In other words, given the importance of these resources, the Guideline specifically calls for a broader valuation than one solely based on restoration and repair.

In *United States v. Haggerty*, the Fifth Circuit rejected the same argument advanced by Ms. Smith, specifically that the restoration value should control. No. 20-50203, 2021 WL 1827316 (5th Cir. May 7, 2021), *cert. denied,* 142 S. Ct. 759, 211 L. Ed. 2d 475 (2022). There, a defendant had poured red paint on a statue of an American Indian. *Id.* at *1. In sentencing the defendant using § 2B1.5, the court had relied upon the total value of the statute based on its purchase price ($92,000) rather than the repair cost ($1,800). *Id.* at *2. The defendant there argued, as Mr. Zepeda does here, that where a resource "is restored to its prior physical condition, it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition." *Id.* at *9 (internal quotations omitted).

The Fifth Circuit found that this "argument plainly fails." *Id.* The Fifth Circuit found that there was no support in the text of the guideline suggesting that the restoration value should control: "There is nothing that suggests that 'the cost of restoration or repair" takes precedence over and obviates the other two valuations." *Id.* at 304. Further, the Fifth Circuit found that the Sentencing Commission's explanation for the new Guideline further undercut the defendant's arguments: "[T]he Commission makes it clear that the harm that it is concerned about when it comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide

24

'flexibility' to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources." *Id.* The Fifth Circuit noted that the Commission had expressly elected not to use the concept of "loss," which was generally relied upon in property destruction cases: "The Commission has elected not to use the concept of 'loss,' which is an integral part of the theft, fraud, and property destruction guideline at § 2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in 'loss.'" *Id.* at *10. In conclusion, the Fifth Circuit found that the defendant's "argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation." *Id.* The Fifth Circuit rejected that invitation.   This Court has already rejected this invitation once.   It should do so again.

In essence, Mr. Zepeda asks this Court to sentence him as if he entered the lobby of a federal building and caused $58,000 in damage to the waiting room. Mr. Zepeda did not do that. Mr. Zepeda specifically targeted a priceless and singular document: our country's founding document. As such, this offense "involved" a cultural heritage resource, and U.S.S.G. § 2B1.5 applies.[7]

Because U.S.S.G. § 2B1.5 applies, the Government calculates the Sentencing Guidelines as follows:

---

[7] The Government acknowledges that Mr. Zepeda's relevant conduct could also embrace the two attacks at NGA, further increasing his Guidelines. The Government has not included these offenses because he was never charged in relation to those offenses and his Guidelines range is already higher than the statutory maximum for these offenses, rendering the issue academic.

| Destruction of Government Property (18 U.S.C. § 1361) | | |
|---|---|---|
| Base Offense Level | 8 | §2B1.5(a) |
| Value > $25M, <$65M | +22 | §2B1.5(b)(1), §2B1.1(b)(1)(M) |
| Cultural heritage resource was from a museum | +2 | §2B1.5(b)(2) |
| Aggravating Role in the Offense[8] | +4 | §3B1.1(a) |
| **Total:** | 36 | |

While Mr. Zepeda did not plead guilty pursuant to a plea agreement, he has accepted responsibility and is entitled to a 2-level reduction pursuant to U.S.S.G. § 3E1.1, and a further 1-level reduction pursuant to U.S.S.G. § 3E1.1(b). Therefore, Mr. Zepeda's offense level is 33.

Mr. Zepeda's criminal history score is either five or six points.[9] Therefore, Mr. Zepeda has a criminal history category of III. With a total offense level of 33, and a criminal history category of III, Mr. Zepeda's Guideline Range is 168-210 months' imprisonment. Because the maximum sentence for this offense is ten years' or 120 months' imprisonment, *see* 18 U.S.C. § 1361, however, the Guideline's range is 120 months' imprisonment. *See* U.S.S.G. 5G1.1(a). The Guideline range for supervised release is one to three years, U.S.S.G. § 5D1.2(a)(2), and the Guideline range fine is $35,000 to $350,000. U.S.S.G § 5E1.2.

---

[8] At the August 14, 2024 plea hearing in this matter, the Government did not identify this enhancement as it had not yet fully reviewed returns from Declare Emergency, Zepeda's phone extraction, or the various roadblock incidents. Based on this evidence, Zepeda held multiple leadership roles at various points in time, led trainings, purchased supplies for these offenses, and these offenses involved five or more participants or was otherwise extensive. *See* U.S.S.G. §3B1.1(a). Therefore, an Aggravating Role enhancement should apply.

[9] The PSIR indicates that Mr. Zepeda was convicted of Petit Theft in Leon County Florida and sentenced to 57 days' imprisonment. PSIR at ¶ 51. The PSIR notes, however, that this could not be verified by public records. *Id.* In any event, a criminal history score of five or six points results in the same criminal history category of III and therefore has no impact on the ultimate sentence.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Zepeda to four years' imprisonment, followed by three years of supervised release, with the condition that he continue to stay out of Washington, D.C., and not visit any museum. The Government also requests that Mr. Zepeda and his co-conspirator pay restitution in the amount of $58,646.25. Upon his release, the Government requests that Mr. Zepeda be required to perform 150 hours of community service. This sentence provides a significant penalty to Mr. Zepeda, commiserate with the severity of his offenses and his lengthy history of participating and leading similar offenses, and a significant deterrent to those who might imitate his crimes.

## I.    The Nature and Circumstances of Mr. Zepeda's Offense.

Mr. Zepeda plotted with others to engage in an attack on our country's founding document: the U.S. Constitution.  Mr. Zepeda's conduct was planned and purposeful.  He knew exactly what he was doing having planned and participated in similar attacks before.  His motivations were entirely political. Mr. Zepeda believed—and undoubtedly still believes—that his political beliefs outweigh anything and everyone else. When Mr. Zepeda threw paint powder over the case of the U.S. Constitution, he had absolutely no concern about the harm it could cause. Mr. Zepeda did not care that he could damage the priceless founding document of our country. He did not care that he could damage the similarly valuable case surrounding it. He did not care that he could damage the historical marble rotunda in which the Constitution was housed. He did not care about the terror he was inflicting on the employees of and visitors to the Archives, none of whom consented to being a part of Mr. Zepeda's political theater.

When Mr. Zepeda threw paint powder over the U.S. Constitution, he caused fear. The

National Archives was forced to evacuate the visitors and many employees who were present that day. None of these individuals knew that this powder (which some inadvertently inhaled) was paint powder. Many undoubtedly feared that they were the subject of a chemical weapons attack, a phenomenon which was not uncommon in D.C. in the not-too-distant past.

When Mr. Zepeda threw paint powder over the U.S. Constitution, he caused harm. Highly trained conservation staff responded to determine the nature of the powder and how to clean it from the priceless and historical Archives rotunda. Teams of people spent days on their hands and knees scrubbing slowly at the floor to undo what Mr. Zepeda had done. It cost more than $50,000 in taxpayer money to clean up Mr. Zepeda's destruction. The Archives have now taken steps to ensure similar offenses do not occur again, enhancing security screening at a cost to taxpayers and future visitors. The Archives was closed for four days, preventing hundreds of visitors from seeing our country's most cherished documents. None of the Archives employees, visitors, or taxpayers asked to be part of Mr. Zepeda's political commentary. And whatever message Mr. Zepeda intended to send was swallowed whole by the fear and harm he inflicted.

What is particularly egregious about Mr. Zepeda's conduct is that he was aware of the significant consequences he would face for committing this crime. By the time Mr. Zepeda committed this offense, three other members of Declare Emergency had already been federally indicted. Indeed, Mr. Zepeda's co-defendant, Jackson Green, had been charged and released only eight days before Mr. Zepeda joined him in soiling the Archives. He committed this offense fully aware of the consequences. In fact, he chose to escalate prior attacks, not just focusing on priceless works of art, but targeting a document of singular importance to our country.

Mr. Zepeda's offense merits a significant term of incarceration.

28

II.    **Mr. Zepeda's History and Characteristics.**

      This is the most recent in a lengthy line of similar criminal offenses for Mr. Zepeda. He has been committing these very crimes his entire adult life. Indeed, he has made engaging in these types of offenses his profession.

      Mr. Zepeda committed his first crime in 2017 when he burglarized an oil facility, receiving a two-month prison sentence as a result. Two months in jail did not deter him. He went on to illegally trespass at three high schools refusing to leave after repeatedly being asked to do so. Arrests and fines in those matters did not deter him. Mr. Zepeda escalated to property damage: pouring a mixture of syrup and colored liquid on the steps of the Florida capitol building and causing $500 in damage, his first attack on a historical building. Mr. Zepeda was imprisoned a second time for this offense, spending another week in jail. Burglary and property damage was not enough for Mr. Zepeda. He began blocking roadways, first blocking an interstate in Florida and then blocking roadways in Washington, D.C. and Arlington. For these offenses, Mr. Zepeda ultimately served around three months in jail, with period of probation. These continued arrests, ninety days in jail, and court supervision did nothing to deter Mr. Zepeda.

      With Declare Emergency, Mr. Zepeda found an organization willing to pay him for his crimes. He began training others in blocking roadways and damaging public works. He did so while still on supervision for at least one of these offenses, completely unconcerned that he could face re-arrest and revocation. While on supervision, after already serving time in prison, Mr. Zepeda's conduct escalated. He helped plan and carry out the attack on Degas' *Little Dancer*. Even after his conspirators were arrested and charged with federal felonies he continued on: planning and executing his most egregious offense yet, an attack on the U.S. Constitution.

Nothing in Mr. Zepeda's history mitigates or excuses his conduct. Despite numerous advantages throughout his life, including the benefit of a stable home and an advanced education, he has chosen to inflict inconvenience, harm, and fear on our community.

Mr. Zepeda's lengthy history of committing similar offenses, his lack of concern for the consequences of his actions, and the lack of any mitigation in his history merits a significant term of incarceration.

## III.    <u>The Need for the Sentence Imposed.</u>

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. Mr. Zepeda is the leader and organizer of a lengthy campaign to block roadways and damage property in our community. He has indicated that he will continue engaging in these offenses regardless of the consequences. Therefore, a period of specific deterrence is required. The requested sentence will prevent Mr. Zepeda from harming our community and others for a significant period of time.

The requested sentence will also provide general deterrence. Since this Court sentenced Declare Emergency member Joanna Smith there has been a significant impact on Declare Emergency "actions." The Court's sentence significantly impacted Declare Emergency's ability to recruit new members and engage in offenses. There has not been an attack since that sentence. Mr. Zepeda has been involved in very one of Declare Emergency's offenses. Sentencing Mr. Zepeda—one of Declare Emergency's leaders—to a significant period of incarceration sends a message to all its members and potential members: these offenses are serious and will result in serious consequences.

Finally, short periods of incarceration have done nothing to indicate to Mr. Zepeda that he

should cease his criminal activity. He has never expressed remorse for his conduct in any of these offenses. He has never expressed any regret for the harm he has caused to NGA, the Archives, their employees, and visitors. A significant sentence is required to deter and hopefully change Mr. Zepeda's repetitive and destructive behavior.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Government requests a sentence of four years' imprisonment, followed by three years of supervised release, to include community service, a continued stay-away from Washington, D.C. and museums, and restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:        */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov